# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURIE ROOT, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 10-1457 |
| KEYSTONE HELICOPTER CORPORATION, | : | |
| Defendant. | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                        **JANUARY 18, 2011**

       Presently before the Court is Defendant Keystone Helicopter Corporation's ("Keystone") Motion for Summary Judgment against Plaintiff Laurie Root ("Root"). For the reasons set forth below, this Motion will be denied.

**I.    BACKGROUND**

       Keystone is in the business of building, repairing and overhauling commercial helicopters. Root was hired by Keystone on or about December 27, 2007, as a material handler to work in its Highlands facility. (Def.'s Mot. Summ. J., Ex. C at 38-39.) Root was later transferred from the Highlands office to the heliplex warehouse. Root has filed a single claim of retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e- 3a. and the Pennsylvania Human Relations Act ("PHRA"), 43 Pennsylvania. Cons. Stat. § 955. Root claims that her employment with Keystone was terminated because she made an earlier complaint against a co-worker for using inappropriate sexual language in the workplace. Root avers in her Complaint that she overheard a co-worker, Robert Watson ("Watson"), "using sexually-charged

language concerning his penis size and other sexual things and reported him to her supervisor, Doug Larson." (Compl. ¶ 8.) Doug Larson ("Larson") is a warehouse manager at Keystone and Root's supervisor. (Def.'s Mot. Summ. J., Ex. B at 31.) Larsen is a registered sexual offender who is listed on the Megan's Law website which, as will be explained infra, is relevant to this case. Root reported Watson's conduct to Larsen in late September 2009. This comported with Keystone's policy which allows an employee to report incidents of harassment or inappropriate language to either his or her supervisor or Human Resources ("HR"). Larsen did not report Root's complaint to HR. (Def.'s Mot. Summ. J., Ex. B at 37-38.)

Larsen testified at his deposition that Root told him that she was having a difficult time working because of so much discussion involving sexual content in the workplace. Larsen stated that he told her that he would look into it and get back to her. (Id. at 36-37.) Larsen testified that later that day, or the next day, he had individual conversations with various people who work for him informing them to refrain from engaging in sexual conversations in the workplace. (Id.) After these conversations, Larsen stated that he went back to Root and told her that he went to the individual people and spoke to them, and that they responded that they would not engage in any such behavior. (Id.) Larsen further stated that Root thanked him and that he received no other complaints after that. Id.) Larsen added that he did not take Root's complaint to HR because he felt he had handled it.[1] (Def.'s Mot. Summ. J., Ex. B at 33-37.)

Watson testified at his deposition that Larsen called on the phone and told him that Root had complained that Watson and another employee named "Pela" were engaging in sexual

---

[1]Root also acknowledges that she never reported her allegation against Watson to anyone at HR. (Def.'s Mot. Summ. J., Ex. C at 73.)

conversation. According to Watson, he told Larsen "that would never happen with me," but he couldn't speak for Pela. (Def.'s Mot. Summ. J., Ex. E at 9-10). Watson also stated to him "if anything is going on, to stop it." (Id.) Root testified at her deposition that after Larsen talked to Watson about her complaint, Larsen came to her later and said, "I talked to him about it and you are not going to be the favorite person around here for a while." (Pl.'s Resp. Mot. Summ. J., Ex. L at 143.) Root also asserts that over the period of the next few weeks, Watson retaliated against her by trying to get her in trouble concerning her work performance. (Id.)

Approximately three weeks after Root reported Watson to Larsen, Watson informed Larsen that Root had been spreading rumors about Larsen having sex with a nine-year-old boy. (Id.) Watson testified that the incident that provoked him to report Root to Larsen was that an employee named Jeffrey Dawkins ("Dawkins") mentioned to him that Larsen was on the news for molesting children. (Def.'s Mot. Summ. J., Ex. E at 14.) During his deposition, Watson identified Dawkins as follow:

> Jeffrey Dawkins, he was hanger support and very friendly. He was actually the reason why I spoke to Doug [Larsen] about this. He came into the cage one day, approached me. And he said - he said, Rob, he said, what is this about your boss being on the news about molesting little kids? And I said on the news? And he saw the look on my face. And he just clammed up right after that. And soon after that, well, he got called away. But I thought, you know, this is really getting out of hand. You know, this woman is going to hurt someone, you know, or cause something to happen with all of these, this gossip going on. It wasn't - that was obviously the worst, there was - she was spreading all sorts of gossip.

(Id.) Watson testified that it was after this conversation with Dawkins that he called Larsen and

identified Root as the source of the rumors about him.[2]  Watson also testified that he had observed Root at least twice in his presence pull up the Megan's Law website on a work computer, and that Root said to him "you know, you have to do something really bad to get on this site."  (Id. at 18.)  Watson stated that he asked Root what Larsen had done to get on the website, and she said Larsen had sex with a nine-year-old boy.  (Id. at 18-19.)

Larsen testified that he immediately went to HR and reported it to HR Manager Ed Tomko ("Tomko").  (Def.'s Mot. Summ. J., Ex. B at 33.)  Larsen told Tomko that he felt Root's behavior was "harassment" against him.  (Id.)  He also testified that he did not inform Tomko that Root reported Watson to him three weeks earlier for making sexual remarks in the workplace.  (Id. at 35-36.)

After Larsen complained to him about Root, Tomko testified that he met with Watson who told him that Root had accessed Larsen's information/identity on the Megan's Law website several times, and shown it to others in the workplace.  (Def.'s Mot. Summ. J., Ex. F at 31-32.)

---

[2] Watson testified:

> Q   Okay.  So you called up Doug Larsen, and you told him what?
>
> A   I said I just thought you should know that somebody that works for you is spreading rumors about you possibly having sex with a nine-year-old.
>
> Q   Did you identify that person?
>
> A   Yes, I did.
>
> Q   Who did you identify?
>
> A   Laurie Root.

(Id. at 17.)

Tomko also stated that he did not believe that Watson told him about anybody else pulling up the Megan's Law website in the workplace, but he did name a co-worker, Brigette Peifer ("Peifer"), as someone who witnessed Root's behavior. (Id.)

According to Root, Tomko did not interview her before her termination or ask her to make a statement. (Id.) Root asserts that Tomko called her into an office with himself and HR Assistant Bridget McAllister, and terminated her employment. (Id.) Root asserts that Tomko said to her that she had been "spreading the rumor that Doug Larsen had been f— ing 9-year old boys." (Pl.'s Resp. Mot. Summ. J., Ex. A at 3.) Root states that she vigorously denied this allegation, and attributed the comments to Watson. (Id. at 7.) Root asserts that Tomko then abruptly fired her. (Id.)

Tomko testified that, at the time he made his decision to terminate Root, his information consisted of the complaint from Larsen and two corroborating witnesses, Watson and Peifer. Tomko stated that his determination was based solely on the fact that he had enough evidence to corroborate what he considered insubordination on Root's part, and that this was the reason for her termination. (Def.'s Mot. Summ. J., Ex. F at 52.) Tomko also added that Root's past work performance had no bearing on the decision. (Id. at 52.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477

5

U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pennsylvania. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Plaintiff. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pennsylvania. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III. DISCUSSION

To establish a prima facie case of retaliation under Title VII, Root must show that (1) she engaged in protected activity, (2) Keystone took a "materially adverse" action against her, and (3)

6

there was a causal connection between Root's protected activity and Keystone's action.[3]  See Moore v. City of Phila., 461 F.3d 331, 341-42 (3d Cir. 2006); see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).  If Root establishes this prima facie case of retaliation, the familiar McDonnell Douglas burden-shifting approach applies and the burden of production shifts to Keystone to articulate a legitimate, nondiscriminatory reason for its action.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Once Keystone meets this relatively light burden, the burden of production returns to Root who must show by a preponderance of the evidence that Keystone's proffered reason is pretextual.  See id. at 804-05.

Regarding the first element of the prima facie case, it is unquestioned that Root engaged in a protected activity by reporting improper sexual comments in the workplace.  Root also meets the second element since Keystone took a "materially adverse" action against her by terminating her employment.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 768 (1998) (noting that firing is an adverse employment action); Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 289 (3d Cir. 2001) (holding that termination "clearly fulfills the second prong of the prima facie case for a retaliation claim").

With respect to the causation prong of a retaliatory claim, the standard in the Third Circuit is whether a reasonable jury could link the employer's conduct to retaliatory animus.  See Jensen v. Potter, 435 F.3d at 449 n.2 (3d Cir. 2006) (explaining that "[t]he ultimate question in

---

[3]Although Root asserts retaliation claims under both Title VII and the PHRA, the prohibitions are equivalent and the analysis is the same.  Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006); Pollard v. George S. Coyne Chem. Co., No. 07-3744, 2008 U.S. Dist. LEXIS 40478, at *21 n.20 (E.D. Pa. May 19, 2008).

any retaliation case is an intent to retaliate vel non"). In assessing this, courts generally focus on two factors: (1) the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and (2) "the existence of a pattern of antagonism in the intervening period." Id. at 450. However, "each case must be considered with a careful eye to the specific facts and circumstances encountered." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n.5 (3d Cir. 2000); see also Burlington, 548 U.S. at 69. Temporal proximity alone may be sufficient to establish the causal connection required for the prima facie case, or may be considered along with other factors in establishing the requisite causal connection. Shellenberger v. Summit Bancorp Inc., 318 F.3d 183, 189 (3d Cir. 2003). "[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn." Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (holding that three-month period between protected activity and adverse action raises inference of retaliation); see Washco v. Federal Express Corp., 402 F. Supp. 2d 547, 559-60 (E.D. Pa. 2005) (dismissing plaintiff's retaliation claim where five months passed between the protected activity and adverse action); Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 415 (E.D. Pennsylvania. 2000) (no causation where six months passed between speech and adverse action).

To prove a causal nexus, Root asserts that in late September 2009, she accused Watson of making sexually inappropriate comments in the workplace and that she was terminated only weeks later on October 17, 2009. While this close temporal connection is not conclusive evidence of a causal nexus between the protected activity and Root's termination as the case law above indicates, we find that it is sufficient to meet this third prong of the prima facie case.

Since Root has established a prima facie case of retaliation, the McDonnell Douglas approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct. 411 U.S. at 802. If Keystone does so, Root must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. Moore, 461 F.3d at 341; see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997). To survive a motion for summary judgment, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. Moore, 461 F.3d 341.

Keystone has met its burden by submitting evidence of a non-retaliatory reason for Root's termination. Tomko considered Root's behavior to be insubordinate, and decided that it was appropriate to terminate Root's employment on that basis. He testified:

> Q. Your decision to let her go was based solely on the fact that you had enough evidence to corroborate the insubordination?
> A. Correct.
> Q. For something like this, this type of allegation how important is it what her past performance was?
> A. It is insignificant. She can be stellar or the worst performer. It has no bearing.

(Def.'s Mot. Summ. J., Ex. F at 52.) In addition, Joseph Tauber ("Tauber"), who was Tomko's superior, testified that he did not conduct any investigation, but received a report from Tomko. (Def.'s Mot. Summ. J., Ex. L at 31.) He stated that Tomko's report indicated that both Watson and Peifer signed statements setting forth that Root had on numerous occasions pulled up the Megan's Law website at her work station, and made scurrilous comments with respect to Larsen and how she felt about that conduct. (Id.) During Tauber's deposition, he stated that the reason

9

for Root's termination was:

> clearly insubordination, undermining the authority of a supervisor, you know, raising issues that should have been private matters to other employees which created or could create, you know, severe morale problems within her department and result in undermining the authority and the respect for the manager of that department.

(Id. at 64-65.)

In addition, Keystone has produced evidence establishing that its reason for Root's termination could not have been pretextual. Keystone shows that its decision-makers involved in the termination, Tomko and Tauber, both did not have any knowledge that Root had reported Watson to Larsen just weeks earlier for inappropriate sexual language in the workplace. Tomko testified that he did not know until after her termination that Root had made an earlier complaint against Watson. (Def.'s Mot. Summ. J., Ex. F at 43.) Tomko was asked at his deposition:

> Q: And you are absolutely 100 percent sure; right, that Larsen did not reveal that there had been sexual– that there had been complaints of sexual comments by Robert Watson?
> A: Yes. Absolutely.

(Id.) In addition, Tauber also stated at his deposition that he did not know that Root had made an earlier allegation against Watson for using offensive sexual language in the workplace before she was terminated. (Def.'s Mot. Summ. J., Ex. L at 47.) Moreover, Root admitted that she had no evidence that either Tomko or Tauber had been told by anyone that she had previously made a complaint against Watson. She testified:

> Q. Right. So you don't have any evidence that either of those guys, meaning Ed Tomko or Joe Tauber, had been told by anyone that there was an allegation against Rob Watson made by you?

>> A. I have no evidence.

(Id. at 75.)

Since Keystone has met its burden of production, the burden shifts back to Root to come forward with evidence that the "employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Krouse, 126 F.3d at 501. In order to get around this obstacle that the decision-makers had no knowledge of Root's earlier complaint against Watson, and to prove that the termination was, indeed, retaliatory, Root has asserted what has been called the "cat's paw"[4] theory of liability. "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decision making power, uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory action." EEOC v. BCI Coca-Cola Bottling Co. of LA, 450 F.3d 476, 484 (10th Cir. 2006.) Under this theory, an employer can be liable where the formal decision maker did not harbor an unlawful motive to terminate the employee. Qamhiyah v. Iowa State Univ. of Sci. and Tech., 566 F.3d 733, 742 (8th Cir. 2009).

Courts have reached different conclusions concerning the circumstances that will justify imputing another employee's animus to the ultimate decision-maker. Federal courts have generally agreed that a plaintiff can establish liability by showing that a decision-maker did nothing more than "rubber stamp" a recommendation made by an employee motivated by

---

[4]Root explains that the "'cat's paw' rule gets its name from a 17th Century French poet, Jean de La Fontaine (1621-1695) and his fable 'The Monkey and the Cat' about a monkey who persuaded a cat to pull chestnuts out of a fire, and how the cat got burned in the process." (Pl.'s Resp. Mot. Summ. J. at 12.) Root states that "as the theory applies to employment law, it would hold an employer legally to blame for discrimination in the workplace by an employee who does not make the actual job decision, but influences the one who does." (Id.)

unlawful animus or that a decision-maker was acting as an unwitting dupe or "cat's paw" for such an employee. See EEOC, 450 F.3d at 484-85 (10th Cir. 2006). However, circuit courts have disagreed whether liability can be imposed when a biased nondecision-maker exercises a lesser degree of control or input concerning an employment decision.

At one end of the disagreement is the United States Court of Appeals for the Fourth Circuit which has refused to extend liability beyond the "cat's paw" or "rubber stamp" paradigms to cases in which a biased employee exercises substantial influence over an employment action, but is not the actual decision-maker. See Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277 (4th Cir. 2004). The Hill court stated:

> [W]e decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.

Id. at 291. Other circuits have declined to adopt this restrictive interpretation and have adopted different approaches, allowing a plaintiff to recover upon a showing that a nondecision-maker's bias "caused" the adverse decision or "substantially influenced" or "tainted" it. See BCI Coca-Cola, 450 F.3d at 487; Lust v. Sealy, Inc., 383 F.3d 580, 584-85 (7th Cir. 2004).

The Third Circuit has not directly addressed the split on this issue among the courts of appeal. It has, however, explained its own decisions as allowing plaintiffs to recover if they can show that a biased non-decision-maker "influenced or participated" in the adverse employment decision. See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001).

In Abramson, a professor contended that she had been terminated from her university because the chair of her department and the dean of her school harbored religious prejudice against her. Both the dean and the department chair had refused to recommend that the plaintiff be retained as a professor, but it was undisputed that the ultimate decision to terminate her had been made by the university president. The district court granted the defendants summary judgment on the plaintiff's termination claim, in part, because there was no evidence in the record to show that the president possessed discriminatory animus toward the plaintiff. The court of appeals reversed, concluding that the record would allow a jury to find that the dean and department chair harbored discriminatory animus and that they "influenced" the president's decision. Because the dean and the department chair "played a role" in the ultimate decision to terminate the plaintiff, the evidence of their discriminatory animus was sufficient to warrant reversal of summary judgment.[5] Id. at 285-86.

As we are required to follow Abramson, we must first point out an important difference between Abramson and the instant case. As noted above, Abramson dealt with a college dean

---

[5]Keystone urges us to follow the Fourth Circuit decision in Hill and the Third Circuit decision, Foster v. New Castle Area Sch. Dist., 98 Fed. Appx. 85 (3d Cir. April 16, 2004). We decline to do so and determine that we are bound to follow Abramson. Foster cites Hill with approval for the proposition that "an employer will be liable not for the improperly motivated person who merely influences a decision, but for the person who in reality makes the decision." Id. at 88. However, as the court stated in McKenna v. City of Philadelphia, "neither Hill nor Foster is binding precedent in this Court. See Jamison v. Klem,544 F.3d 266, 278 n.11 (3d Cir. 2008). Moreover, both the holding in Hill and the statement in Foster directly contradict Abramson's holding that animus can be imputed to a decision-maker on the basis of a prejudiced employee's influence into the ultimate decision." Nos. 98-5835, 99-1163, 2010 WL 2891591 at *28 (E.D. Pa. July 20, 2010). Thus as a precedential decision, Abramson binds this Court and determines what showing Root must make to establish that Watson's animus motivated Keystone's termination decision.

and department head who recommended to the college president, the sole decision-maker, that the plaintiff not be retained as a professor. Thus, the <u>Abramson</u> court determined that a jury should decide whether these employees had discriminatory animus which had an "influence" or "played a role" in the president's decision to terminate. 260 F.3d at 285-86. Here, Watson was only a coworker of Root. He had no authority to recommend any disciplinary action against Root. However, there is no language in <u>Abramson</u> requiring that an employee has to be more than a mere coworker to have an "influence" on the decision-maker. Indeed, it can certainly be argued that Watson had an "influence" or "played a role" in Root's termination by the mere fact that it was he who first reported her alleged conduct to Larsen and later gave HR a statement detailing such. Thus, we find that there exists a genuine issue of material fact for a jury to determine whether Watson had discriminatory animus that "influenced" or "played a role" in Root's termination. For these reasons, Keystone's Motion for Summary Judgment is denied.[6]

An appropriate Order follows.

---

[6]Root also argues that Keystone, and in particular Tomko, failed to conduct a thorough investigation of Root's conduct because Watson provided all of the information regarding Root's conduct to Tomko, either through his story or through his friend, Peifer. (Pl.'s Resp. Mot. Summ. J. at 14.) Root asserts that Peifer is not a credible witness because she is a close friend of Watson. Root also attacks Peifer's credibility stating that she was replaced by Root in her heliplex job, and that she had motive to want Root terminated because she wished to come back to the heliplex department. (<u>Id.</u> at 15.) Root argues further that Tomko disregarded key material facts as to what others were doing in the workplace. Root asserts that the information about Larsen being on the Megan's Law website was well-known in the workplace and spoken about by other co-workers. (<u>Id.</u>) As we are denying Keystone's Motion, Root is free to pursue these issues at trial in establishing Watson's animus and "influence" on the decision to terminate her.